CHARLES W. WELCH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent JEAN E. WELCH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Welch v. Commissioner
Docket Nos. 8888-73, 8889-73.
United States Tax Court
T.C. Memo 1977-252; 1977 Tax Ct. Memo LEXIS 188; 36 T.C.M. (CCH) 1020; T.C.M. (RIA) 770252; August 2, 1977, Filed J. Richard Johnston, for the petitioners. John E. Lahart, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income *189 taxes and additions to tax under sections 6651(a) [1]/ and 6653(b): Charles W. Welch
Addition to Tax Year
Deficiency
(sec. 6653(b))
1962
$14,308.24
$7,154.12
1963
6,100.88
3,050.44
1964
1,504.61
752.31
1965
5,919.58
2,959.79
Jean E. Welch
1963
$ 5,841.68
$1,460.42
1964
1,245.41
311.35
1965
5,660.38
1,415.09
Other issues having been settled, those remaining for decision are as follows: 1. Whether funds received, either directly or through payments to his creditors, by petitioner Charles W. Welch in each of the years 1962 through 1965 from the New Golden Hotel Company and its affiliated entities constituted taxable income to him and petitioner Jean E. Welch. 2. Whether petitioners are entitled to a deduction for 1965 in the amount of $8,537.86, for accrued interest on the funds received from the New Golden Hotel Company and its affiliated entities for 1962 through 1965. 3. Whether any part of the underpayment (if such underpayment exists) of taxes for each of the years 1962 through 1965 was *190 "due to fraud" within the meaning of section 6653(b). 4. Whether the assessment of the disputed deficiency for 1962 is barred by the statute of limitations prescribed by section 6501(a). FINDINGS OF FACT 1. General
Petitioners Charles W. Welch and Jean E. Welch were husband and wife during 1962 through 1965, the years here in controversy. They were divorced on March 10, 1966, but all their income and expenses during 1962 through 1965 were community income and expenses. At the time their respective petitions were filed, both petitioners were legal residents of the State of Nevada. Petitioners' cases were consolidated for trial, briefing, and opinion. [2]/ Petitioners filed a joint Federal income tax return for 1962. Joint Federal income tax returns were also prepared for 1963 through 1965 but were not filed. Charles W. Welch *191 (hereinafter Welch or petitioner) is a certified public accountant who obtained his licenses to practice in California and Nevada in 1948 and 1959, respectively. For several years, Welch practiced as a self-employed certified public accountant. From 1959 to April 1962, he conducted his accounting practice from his ranch, named the Run Around Ranch, near Gardnerville, Nevada. During this period he also was engaged in various ranching activities which consisted principally of the production and sale of livestock. Petitioner Jean E. Welch was not employed outside of the home. On November 5, 1969, Welch was indicted for attempted income tax evasion for 1963, 1964, and 1965. During the course of the trial, the court granted a motion for judgment of acquittal as to 1964, and, at the conclusion of the trial, the jury returned a verdict of not guilty as to the other 2 years. The jury found Welch guilty of willful failure to file a return for 1965, a misdemeanor. From about 1959 to 1962, Welch conducted part-time audit work for a casino and hotel named Golden Casino in Reno, Nevada. He prepared the returns and did financial consulting for the Golden Casino during this period. *192 In April 1962, a fire destroyed most of the physical structure of the casino and hotel. Shortly after the fire, Welch was requested to devote his full time to the collection of the fire insurance proceeds, the financing for, and construction of, a new structure, and the control and maintenance of necessary business records.Thereafter and continuing through 1965, petitioner maintained or supervised the maintenance of all records of the Golden Casino. During 1962 through 1965, the Golden Casino consisted of several interrelated entities. The principal entity was the New Golden Hotel Company, Inc. (hereinafter the New Golden Hotel Company), a corporation in which William Tomerlin and James Tomerlin (hereinafter referred to jointly as the Tomerlins) each owned 50 percent of the stock. Welch was corporate secretary. That corporation owned the casino and hotel facilities and leased them to the Golden Bank Operating Company, a limited partnership composed of the Tomerlins and the New Golden Hotel Company. The partnership in turn leased the casino portion of the premises to the Golden Casino Company, a partnership composed of the Tomerlins, the New Golden Hotel Company, and Dominick *193 A. Stillian, the casino manager. The New Golden Hotel Company and the Golden Bank Operating Company had been in existence prior to the fire in April 1962. The Golden Casino Company was formed after the fire. Hereinafter this cluster of entities will be referred to as the Golden Casino or Golden entities except where preciseness dictates otherwise. After the fire and at the time that Welch agreed to devote full time to handling the problems confronting the Golden entities, petitioner expressed to the Tomerlins the concern that he did not want to lose his ranch. The Tomerlins agreed that Welch was to receive a basic fee of $600 per month and that additional money would be made available to him to meet his financial needs. The basic fee paid petitioner was subsequently increased to $1,000 per month and in 1964 to $1,500 per month. The meeting between Welch and the Tomerlins shortly after the fire of April 1962, was characterized as a special meeting of the board of directors of the Golden Casino. However, the minutes reflecting such meeting, though signed by the Tomerlins, were prepared long after the date of such meeting and after the Internal Revenue Service's investigation *194 of petitioner's tax liabilities for the years at issue had begun. Prior to April 1962, the Tomerlins had loaned Welch a total of $39,370. In 1962 and 1963 these loans were forgiven. Welch correctly reported $22,500 of the total amount as income in 1962, and he correctly included the balance as income on his unfiled 1963 return. 2. The Minden Bank Account
On July 24, 1962, Welch opened a commercial account in the name of the New Golden Hotel Company at the Minden, Nevada Branch of the First National Bank of Nevada, approximately 50 miles from Reno. Into this account he caused to be deposited a number of insurance checks totaling more than $75,000 issued to the New Golden Hotel Company as a result of the fire. Other deposits were also made in the account. Frank A. Lyon, an auditor of the company, and Welch were authorized to sign checks on the account. On four different occasions, funds amounting to more than $23,000 were transferred from the Minden account to other Golden Casino accounts to meet emergencies. The principal bank account of the Golden entities was at the First National Bank of Nevada at Reno, Nevada. Welch drew numerous checks, totaling $37,743.50 *195 in 1962 and $23,140.16 in 1963, on the Minden account which were made payable either to Welch or to others for his benefit. With only a few exceptions, Welch recorded the withdrawals of Golden Casino funds from the Minden account on his records of "Accounts--Notes--Contracts Payable" as loans payable to New Golden Hotel Company. However, no promissory notes or other forms of documentation were executed by petitioner or the Tomerlins in respect of the withdrawals. The Minden account was closed on December 31, 1963. For the most part, Welch recorded these minden checks in the New Golden Hotel Company records as "deferred financing expenses." Fearing the possible loss of his ranch if the corporation failed and a receiver was appointed, petitioner used this method to protect himself from being treated as a debtor of the corporation. In his statutory notice of deficiency, respondent determined that the checks withdrawn from the Minden account during 1962 and 1963 constituted taxable income to petitioners in the following amounts: Year
Charles W. Welch
Jean E. Welch
1962
[1] $38,273.12
0
1963
$11,570.08
$11,570.08
*196 3. 1964 Golden Casino Checks
In 1964, petitioner caused the Golden Casino Company to issue one check in the amount of $1,565.78 payable to Sturgis Ranch for the purchase of hay and two checks in the amounts of $708.54 and $1,200 payable to Minden Milling Company for the reduction of petitioner's trade account balance due to that company. These three checks, totaling $3,474.32, were all dated March 20, 1964, were all drawn on the account of Golden Casino Company, and were all signed by James O. Tomerlin. The accounts receivable journal of Golden Casino Company reflected an entry made on May 31, 1964, of a receivable due from Meadow Gold Dairy in the amount of $3,474.32. In December 1964, another journal entry reduced the accounts receivable of Meadow Gold Dairy in the amount of $3,474.32 and charged this amount as a receivable due from New Golden Hotel Company. The explanation of the journal entry was "To transfer to New Golden Hotel Company for assumption against accounting fees." In December 1964, a general journal entry on the books of New Golden Hotel Company charged the amount of $3,474.32 as an operating expense for accounting fees and credited the same amount *197 to Golden Casino Company. The explanation of the journal entry was "To credit Golden Casino Company with Meadow Gold account assumed in connection with earned accounting fees." The sum of $1,908.54 representing the checks for $708.54 and $1,200 payable to Minden Milling Company was recorded in petitioner's journal as an account payable due the Golden Casino Company for payments to Minden Milling Company. No notes or other evidence of indebtedness, however, were executed by petitioner or his employer. The sum of $1,565.78, representing the check payable to Sturgis Ranch was not recorded on the books of petitioner as income or as a loan, nor was such sum claimed as a farm expense on petitioner's record of farm expenses. In his statutory notice of deficiency respondent determined that these Golden Casino Company checks represented taxable income in 1964 to petitioners in the amount of $3,474.32. 4. 1965 Golden Casino Checks and Accrued Interest Deduction
In 1965, Golden Casino Company issued 31 checks, all signed by one of the Tomerlins, totaling $44,250, payable to petitioner and deposited by petitioner in his bank account or payable to third parties but deposited by *198 petitioner to his personal account. Petitioner recorded 24 of these checks, totaling $31,250, in his ledger as accounting income. Petitioner recorded the balance of the Golden Casino Company 1965 checks totaling $13,000 as loans payable to New Golden Hotel Company. However, there were no notes or evidences of indebtedness executed by petitioner or his employer in respect of this amount. Typically, the checks from Golden Casino Company which were recorded as loans by petitioner, as well as those checks recorded as accounting income, were reflected on the disbursement journal of Golden Casino Company as "accrued rent." In turn, the general journal of Golden Bank Operating Company reflected a debit to "accrued rental" payable to New Golden Hotel Company and a credit to accounts receivable for rent due from Golden Casino Company. Finally, the general journal of New Golden Hotel Company reflected a debit to legal and accounting fees and expenses and a credit to rent receivable due from Golden Bank Operating Company. In 1965 Golden Bank Operating Company issued 4 checks, each signed by one of the Tomerlins, payable to the First National Bank account of Charles W. Welch in the *199 total amount of $6,100. On the cash disbursements journal of the Golden Bank Operating Company three of these four checks were shown as issued to the New Golden Hotel Company for accrued rent. On the books of the New Golden Hotel Company, these same three checks were expensed as accounting fees. Petitioner recorded two of the above Golden Bank Operating Company checks, totaling $2,100, on his ledger as accounting income. Petitioner recorded the remaining two Golden Bank Operating Company chCks, totaling $4,000, as loans payable to the New Golden Hotel Company. However, there was no further note or documentation to evidence such indebtedness. In 1965 the New Golden Hotel Company issued one check for $750 to petitioner which petitioner recorded as accounting income in his books and records. Thus petitioner's ledger reflects the sum of $34,100 as accounting income for 1965 consisting of the following: 24 checks from Golden Casino Company
$31,250
2 checks from Golden Bank Operating
Company
2,100
1 check from New Golden Hotel Company
750
Total
$34,100
Petitioner's copy of the unfiled 1965 income tax return reflects accounting net income as follows: Gross receipts
$34,100.00
Expenses
3,332.97
Net income
$30,767.03
*200 In his statutory notice of deficiency, respondent determined that petitioners had understated their taxable income in 1965 by $22,500, of which $17,000 represented checks recorded as loans to petitioner payable to New Golden Hotel Company. In his records for 1965, Welch computed the amount of $8,537.86 for interest accrued, but not paid, for the monies he received from the Golden entities. In schedule F of his unfiled 1965 return, Welch showed a deduction for interest expense in the total amount of $13,711.46, which included $8,537.86 of interest accrued on his alleged indebtedness to the Golden entities.
At some time in 1965 or 1966, Welch prepared a summary schedule of the amounts received by him from the Golden entities during 1962 through 1965. He showed these amounts as loans on this schedule and computed interest at the rate of 6 percent on the alleged outstanding balances. 5. The Internal Revenue Service Investigation
Special Agent Kaminski (hereinafter Kaminski) began his investigation of petitioners' income tax liabilities for the years in issue on May 9, 1967. During Kaminski's initial interview with Welch on June 7, 1967, Welch stated that he had mailed *201 the 1964 Federal income tax return. However, the Internal Revenue Service records do not show that a Federal income tax return was filed by petitioners for 1964. With respect to the 1965 return, Welch stated that he had given it to his wife, Jean E. Welch (hereinafter Jean), for her to give it to a relative, who lived in Chicago, for review. However, Jean informed Kaminski that she had no relative in Chicago capable of examining or reviewing an income tax return. Also during this initial interview, Kaminski asked Welch if he had copies of income tax returns for 1963, 1964, and 1965, and Welch responded that he did not. Yet at a subsequent interview with Kaminski on June 15, 1967, Welch provided the agent with penciled copies of his 1962 through 1965 Federal income tax returns.He informed the special agent that he had found these copies with materials that his wife had stored in Chicago. Jean informed Kaminski that she had not stored any of Welch's records. The copies of the returns for each year reflect significant farm losses. Accounting net income stated on these copies is in an amount just less than the amount of the claimed farm losses. During a meeting with Kaminski's *202 supervisor, Chief of Intelligence Daniel M. Smith, Welch stated that Kaminski had not checked the corporate minutes (referred to above) of a special board of directors' meeting of the Golden Casino, which purportedly justified Welch's receipt of certain monies from the Golden entities. Welch then presented Smith with purported corporate minutes which he represented to have been typed by petitioner or his secretary within 2 weeks of April 7, 1962, the alleged date of the special directors' meeting. At the same meeting with Smith, when confronted with apparent typing peculiarities, Welch admitted that the particular corporate minutes presented to Smith had been typed after Special Agent Kaminski's investigation had begun.
OPINION Petitioner's employer paid him a base salary of $600 per month which was later increased to $1,000 and, still later, to $1,500 per month. Petitioner maintains that his employer also agreed to loan him money, as needed, to cover his expenses in connection with the operation of his ranch pending a final agreement as to the amount of the compensation to which he was entitled for his services in reviving and restoring the hotel and casino business that had *203 been destroyed by fire. Consequently, petitioner contends, his withdrawals of $37,743.50 in 1962 and $23,140.16 in 1963 from the Minden bank account, carried in the name of the New Golden Hotel Company, were nontaxable loans from his employer.Similarly, petitioner contends that the checks in the total amounts of $3,474.32 in 1964 and $17,000 in 1965 from the Golden entities deposited to his personal accounts or endorsed to third parties for his benefit were also loans. Respondent contends the funds petitioner obtained from the Golden entities during all 4 years--1962 through 1965--were taxable income and, further, that the resulting deficiency in each of these years is "due to fraud" within the meaning of section 6653(b). Respondent denies that petitioner received the funds as loans but does not clearly state the legal theory on which he relies. Citing and quoting from , where the Supreme Court held that embezzled funds were taxable, respondent appears to argue that the withdrawals from the Minden account were embezzlements. Alternatively, relying on , respondent *204 maintains that, if the withdrawals were advances intended as compensation for future services, they were taxable when received. The burden of proving that respondent erred in determining the disputed deficiencies rests with petitioners. . On the other hand, under section 7454 the burden of proving fraud is upon the respondent, and fraud must be proved by clear and convincing evidence. . We do not think either party has carried his burden of proof. The only witnesses that respondent called were two Internal Revenue Service agents who investigated the case. Petitioner offered only his own self-serving testimony. The only witnesses who could have provided unbiased testimony as to the terms of the agreement which petitioner had with the Golden entities were the Tomerlins, petitioner's employer. Both of them were apparently available for testimony, but for some reason, not explained in the record, neither party called them. We decline to presume, as petitioner asks, that the Tomerlins' testimony would have been adverse to respondent's position. Rather since the *205 Tomerlins were equally available for subpoena by both parties, no presumption arises from either party's failure to call them. See , affg. in part and revg. in part . However, we think that the Tomerlins' testimony was equally crucial to petitioner's position with respect to the deficiencies and to respondent's position on the fraud issue and the failure by both sides to elicit such vital testimony leaves a gaping hole in the record before this Court. Without their testimony, we can only conjecture as to the terms of the agreement which petitioner had with his employer. Such speculation cannot be used by either party to carry his burden of proof. Prior to the fire in April 1962, the Tomerlins had loaned petitioner a total of $39,370. In 1962 and 1963, these loans were forgiven, and petitioner reported $22,500 of the total amount as income in 1962 and included the balance on his unfiled 1963 return.It is stipulated that Welch's treatment of the forgiveness of these loans as income in 1962 and 1963, rather than in the years in which the money was actually received, is *206 correct. Petitioner maintains that the 1962 and 1963 withdrawals from the Minden account had the same character, and that he treated them tax-wise in the same manner as these prior loans. Yet whether the terms on which petitioner received the loans forgiven in 1962 and 1963 were the same as the terms on which he received the 1962 and 1963 Minden account withdrawals cannot be definitely ascertained without the testimony which could have been given on that point by the Tomerlins. One of the exhibits introduced in evidence was a document purporting to be the minutes of a special meeting of the board of directors of New Golden Hotel Company held on April 7, 1962. These minutes recite, among other things, that petitioner was to be paid a basic monthly fee and that "financial assistance [would] be given him with any personal financial problems arising out of absence from the ranch or neglect of his personal affairs." The minutes reflect the adoption of a resolution stating that his final compensation was to be determined upon "the extent of the services rendered, the accomplishments of the engagements and taking into consideration fees already paid and loans to meet financial emergencies. *207 " Petitioner admitted that this version of the minutes was typed after the Internal Revenue Service investigation began, but he testified that it represented a more complete version of an earlier set of minutes. While the circumstance that this version of the minutes was typed after the tax audit began creates suspicion, the fact remains that these minutes were signed by the Tomerlins. If the minutes reflect the actual agreement between petitioner and his employer, regardless of when they were typed, they provide support for petitioner's contention that the amounts withdrawn from the Minden account were loans. But, again, we do not have the Tomerlins' testimony on this point. Respondent argues that the Tomerlins did not even know of the creation of the Minden account. However, since over $75,000 of the insurance proceeds, which were so crucial to the capital needed for the reestablishment of the hotel and casino operation, were deposited in that account, it seems likely that the Tomerlins knew about the account. Indeed, on four occasions funds totaling over $23,000 were transferred from the Minden account to the accounts of other Golden entities. The account was carried in *208 the name of the New Golden Hotel Company, and the Golden entities' auditor, as well as petitioner, was authorized to draw checks on the account. Yet only the Tomerlins could have finally resolved the issue as to whether they had knowledge of the existence of the account and, if so, whether petitioner was authorized to make the 1962 and 1963 withdrawals.We are left to speculation as to what their testimony would have been.
During 1964 and 1965, petitioner continued to receive sums from one or more of the Golden entities and treated his receipts as loans. The disputed checks in both years were actually signed by the Tomerlins. Here, again, testimony of the Tomerlins is crucial in ascertaining the character of these transactions. In summary, we are not prepared to accept petitioner's uncorroborated testimony as to the transactions in issue. Accordingly, we sustain respondent's determinations as to the deficiencies for 1963, 1964, and 1965, including the disallowance of petitioner's claimed interest deductions for 1965. However, respondent's right to assess and collect the deficiency for 1962 depends on our determination of the fraud issue for that year since it is otherwise barred *209 by the statute of limitations prescribed by section 6501(a), and fraud has not been shown. As a certified public accountant, petitioner is charged with knowledge of appropriate accounting practices as well as the tax laws. It is clear that entries on his personal records reflecting the 1962 and 1963 withdrawals and the 1964 and 1965 checks were not consistent with those on his employer's records over which he had control. For example, on his records he treated, for the most part, such sums as nontaxable loans but on his employer's records he treated the same sums as currently deductible expenses. This inconsistency is not fully explained.As to at least those funds received from the Minden bank account, petitioner explained that he intended to conceal their receipt to protect himself from being treated as a debtor of the corporation if the corporation failed and a receiver was appointed. Such an explanation is not fully illuminating and does not give us an insight as to the reason for other arbitrarily assigned and often misleading entries. But without the background which could have been provided by the Tomerlins as to their business arrangements with petitioner, we do not *210 think that petitioner's suspicious accounting techniques are sufficient to support an inference that petitioner's returns for 1962 through 1965 were fraudulent. As proof of fraud, respondent relies heavily upon petitioner's conduct in dealing with the Internal Revenue Service agents during their investigation, detailed in our Findings, and we agree that it was reprehensible. But that conduct occurred after the close of the tax years in issue and appears, on close analysis, to have been designed to convince the investigating agents that petitioner did not wilfully fail to file returns for 1963, 1964, and 1965. Indeed, if petitioner's loan theory and resulting computations on his unfiled returns (reflecting no taxable income for those years) were correct, then there were no deficiencies and, consequently, no basis for imposing the section 6653(b) penalties. We think it reasonable to assume that the Tomerlins testified at the criminal trial. The jury returned a verdict of not guilty on the section 7201 tax evasion charge for 1963 and 1965, and the court dismissed the charge as to 1964. The record before us does not show clearly whether the Tomerlins consented to the withdrawals *211 from the Minden account or whether such withdrawals and other advances otherwise were income when received. Without the Tomerlins' testimony, fraud has not been shown. Accordingly, petitioner is not liable for the determined additions under section 6653(b), and the assessment of the deficiency for 1962 is barred by the statute of limitations.Petitioners are liable for the determined deficiencies for 1963, 1964, and 1965. To reflect the foregoing, Decisions will be entered under Rule 155.* Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue.
2. /↩ Respondent has conceded by stipulation that there are no penalties due from petitioner Jean E. Welch, but asserts that the fraud penalty is applicable against petitioner Charles W. Welch for each of the years 1962 through 1965. Petitioner Jean E. Welch remains a part of this case because of its community income aspects.
1. Respondent, on brief, adjusted this figure to $37,743.50.↩